## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NYASHA MITCHELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )  Case No.: |
| DR. MARK T. ESPER, SECRETARY | ) |
| U.S. DEPARTMENT OF DEFENSE | ) |
| 100 DEFENSE PENTATGON | ) |
| WASHINGTON, DC 20301-1000, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## COMPLAINT

Nyasha Mitchell, by and through undersigned counsel, makes the following complaint under Title VII, 42 U.S.C. § 2000e *et seq.*, for discrimination based on race and for retaliation for her protected activity. Ms. Mitchell demands a trial by jury on all issues so triable.

### JURISDICTION, PARTIES, & EXHAUSTION

1.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

2.      Defendant is the Secretary of Defense located at 1000 Defense Pentagon, Washington, D.C. 20301-1000.

3.      Plaintiff Nyasha Mitchell is an African American female, who resides at 11214 St. Christopher Drive, White Plains, MD 20695.

4.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

5.      Mitchell satisfied the administrative prerequisites for filing suit by contacting an EEO counselor within the required time limits on or about September 7, 2016.

6.      Mitchell filed a formal complaint of discrimination and retaliation on October 24, 2016, against the Defendant.

7.      Mitchell's formal complaint listed a continuing line of racially discriminatory incidents starting May 27, 2016.

8.      Mitchell's EEOC case, No. 570-2017-01410X was litigated before an Administrative Law Judge, who denied Summary Judgment to the Defendant.

9.      An EEOC hearing was held in January, 2020.

10.      The Administrative Judge issued a Judgment for the Agency following the hearing on or about March 25, 2020.

11.      Mitchell never received the Agency's final agency decision.

12.      This Federal Complaint is being filed within 130 days of the Administrative Judge's decision.

13.      As such, Mitchell has satisfied all administrative requirements and exhausted her administrative remedies before bringing this claim.

**FACTS**

14.      Mitchell began working for the Defense Intelligence Agency in 2009.

15.      In 2013, Mitchell began working for the Americas Regional Center.

16.      Up until 2015, Mitchell was an excellent employee and never received any reprimands, Performance Improvement Plans, or Performance Action Plans.

17.      James Medler was Mitchell's first line supervisor in 2013 and again from July 2014, to approximately October, 2015.

18.     In approximately, October, 2015, Raymond McAllister became the acting division chief of the Eastern Hemisphere Transnational Organized Crime Division and, as a result, became one of Mitchell's supervisors.

19.     McAllister served in that role of Acting Division Chief until the end of 2016.

20.     As McAllister was preparing to take this role, he met with Mitchell, who complained to McAllister about racial discrimination in the office.

21.     Between May, 2015 and November 1, 2017, Joy Mitchell was the Branch Chief of Recruitment in the Human Resources office.

22.     Between October, 2015 and May 31, 2016, McAllister repeatedly approached Nyasha Mitchell about her career development.

23.      Between October, 2015 and May 31, 2016, McAllister repeatedly approached Nyasha Mitchell about her career development, even though Mitchell repeatedly told McAllister to leave her alone about this issue because she had made her own connections and efforts with the career development office.

24.     While Medler was Mitchell's first line supervisor, he permitted her to maintain a flexible work schedule due to her family situation.

25.     McAllister has admitted that he didn't get along with black women, and he gained the nickname Uncle Tom or UT.

26.     Within about a month of becoming the acting division chief, Mitchell's performance objectives were changed, and she was wrongfully issued a Letter of Counseling.

27.     For approximately three months in 2016, McAllister acted as Mitchell's direct supervisor because her regular supervisor was mostly out of the office.

28.     During those three months from June to August 2016, McAllister issued three Letters of Counseling to Mitchell without factual justification and improperly included Sonya Bowman, a peer, when giving Mitchell the Letter of Counseling on June 2, 2016.

29.     McAllister admitted at hearing that Letters of Counseling are not good things and can affect an employee's career.

30.     Medler never issued Mitchell a reprimand, Performance Improvement Plan ("PIP") or Performance Advisory Letter ("PAL").

31.     In Mitchell's 2016 Midyear review she was on point to complete her performance goals.

32.     On May 27, 2016, McAllister called a meeting with Mitchell in which he ultimately rescinded her flexible work schedule.

33.     McAllister contended that Mitchell was manipulating her work schedule.

34.     McAllister claimed the purpose of the May 27, 2016, meeting was to provide Mitchell career counseling.

35.     McAllister further claimed that at the meeting he offered her an opportunity to do the Africa briefing.

36.     McAllister contends the Africa briefing would have been at approximately 8:30 am.

37.     Actually, Medler testified that the Africa briefing could have been as early as 6:30 am.

38.     McAllister denies the schedule manipulation issue was brought up at this meeting.

39.     After this meeting, NM's schedule remained the same. The schedule was satisfactory.

40.     The June 2, 2016, Letter of Counseling contends that Mitchell was rude and disrespectful at the 5/27/16 meeting. Exhibit 1.

41.     The allegations of said Letter of Counseling were completely false.

42.     The Letter of Counseling issued on June 16, 2016, was allegedly for performance issues, including the requirement to develop 3 analytic products per quarter IAW DIA/ODNI analytic tradecraft standards. Exhibit 2.

43.     The June 16, 2016 Letter of Counseling contended that Mitchell was behind in her products. Id.

44.     The June 16, 2016 Letter of Counseling contended that Mitchell was behind in her annual requirement to "initiate and lead a joint collaborative production effort to meet a client's need or requirement." Id.

45.     The contentions on the June 16, 2016, Letter of Counseling were totally false.

46.     Medler admitted that the annual requirement for developing analytic products is 12 per year, not one per month.

47.     Developing an analytical product once a month is unrealistic because there are a number of factors out of the analysts control in developing the product.

48.     As such, some months will have three analytic products, others might not have any.

49.     There is no evidence that Mitchell was in danger of not completing her joint collaborative production effort by the end of the performance year.

50.     There was no requirement to initiate that annual requirement by any calendar day.

51.     McAllister initiated the conversation with Medler about issuing the June 16, 2016, LOC.

52.     But McAllister did not issue a Letter of Counseling to a white peer, Sonya Bowman, who did have performance issues according to the agency.

53.     Both Medler and McAllister were aware of Bowman's analytical struggles. Rather than issue a LOC, they promoted her to management.

54.     Sometime around August 26, 2016, McAllister reported to April Hodges that Nyasha Mitchell was wasting time in a different division. He says he got a message from the AMRC director that she spent a lot of time up there.

55.     Mary Matthews, the Director of the Americas regional center, contended that Mitchell was up in her division two days in a row, August 25, 2016 and August 26, 2016.

56.     McAllister showed the jabber message to April Hodges (after a phone call) on or about August 26, 2016. Exhibit 3 (ROI page 36).

57.     Hodges asked McAllister on or about August 26, 2016, whether Mitchell was on a PIP.

58.     Hodges advised McAllister that there was nothing the Agency could do about it unless Mitchell's behavior truly bothered the manager, Mary Matthews.

59.     Following these instances of discrimination, McAllister, in September 2016, involved Mitchell's coworkers in his supervisory decisions by telling them that McAllister planned to put Mitchell on a Performance Improvement Plan.

60.     Specificaly, on September 14, 2016, McAllister met with Bradley and Amanda Marshall, presenting to them a picture of three LOC's leading to a PIP. Exhibit 4 (ROI page 35).

61.     Said conversation was all with respect to Nyasha Mitchell.

62.     Mitchell never asked Amanda Marshall or Bradley to intervene on her behalf.

63.     April Hodges testified that it is not proper for a division chief to discuss a co-worker with other co-workers, no matter how well intended that could have been.

64.     As a final act of discrimination in 2016, Mitchell's 2016 performance appraisal originally improperly included comments regarding the previous Letters of Counseling. The comment was corrected, but the scores were unchanged.

65.     In early 2017, McAllister assumed his position in a permanent capacity.

66.     Mitchell had communicated her desire to work in security to McAllister on several occasions. Despite this, McAllister did not tell Mitchell about an opportunity with the office of security.

67.     In March, 2017, Mitchell discovered an opportunity for a 90 day rotation to the Career Processing Center to help process new hires.

68.     In order to be considered for the opportunity, Mitchell had to submit her application through her supervisor, McAllister.

69.     McAllister did not submit Mitchell's packet on the due date.

70.     McAllister contended he was out of the office the date the packet was due.

71.     McAllister testified that he never told Mitchell the reason he did not submit the packet was because she was not eligible for the tasker based on the billet she occupied.

72.     He later testified that he recommended her for it because she was changing career fields.

73.     McAllister attested that when the billet was released, the agency had no one to fill it due to the requirements.

74.     McAllister also attested that he explained to Mitchell that she was not eligible for the tasker based on the billet she occupied.

75.     McAllister also attested that he told Mitchell he would make a special attempt to accommodate her.

76.     However, made no attempt to accommodate Mitchell.

77.     McAllister announced in front of Mitchell's coworkers that he was not going to submit her packet.

78.     McAllister also attested that regarding the rotational assignment, Mitchell wanted to work in security anyway; so she might be eligible for it and he wanted to at least introduce her to a job in security.

79.     Ultimately, McAllister submitted the application after the deadline to the Center Chief, Mary Matthews, who disapproved of it.

80.     The reasons listed on the March 24, 2017, memorandum rejecting Mitchell's application for the aforesaid rotational assignment were: (a) her supervisor was planning to put her on a PIP; (b) Mitchell was not eligible for the billet; and (c) Mitchell was badly needed for the Africa team. Exhibit 5 (ROI at 459).

81.     Each of these reasons was false.

82.     Her supervisor was never planning to put her on a PIP.

83.     There were exceptions to the DASD-CN requirements that Mitchell could have met.

84.     If Mitchell's performance was so bad, she wouldn't have been needed on the Africa team.

85.     In April, 2017, Joy Mitchell was the Branch Chief of Recruitment in the Agency's Human Resources Department.

86.     There was an opening in April, 2017, for a Human Resources Specialist (Generalist) position in the Office of Human Resources.

87.     Said position was advertised. Exhibit 6.

88.     The position as advertised was open to all fields in grades 10-11 and to all career specialties.

89.     Nyasha Mitchell applied for that position.

90.     Nyasha Mitchell was selected for the aforesaid position.

91.     The position was a recruiting position.

92.     However, Mitchell was not moved into the new position based on an assertion that she was not qualified, despite meeting all the qualifications in the posting.

93.     The reasons stated were that Nyasha Mitchell lacked prior human resources experience.

94.     The reasons given for failing to move Nyasha Mitchell into the position were false because prior human resources experience was not necessary for the position.

95.     McAllister accused Mitchell and another African American coworker, Yasmine Watts, of creating a hostile work environment towards another co-worker, Amanda Marshall in a Memorandum of Record dated April 19, 2017.

96.     Mitchell, Watts and Marshall were friends.

97.     McAllister knew of their friendship.

98.     These three teased each other in front of the other co-workers.

99.     Said teasing was a common occurrence.

100. Marshall testified that she did not want to file a complaint against Mitchell or Watts.

101. McAllister testified that Marshall came to him to file a complaint.

102. McAllister contended that which was false and contradicted by the person who allegedly brought the issue to McAllister.

103. On or about March 1, 2018, the Agency, through Sonya Bowman, issued Mitchell a Letter of Reprimand.

104. The Reprimand contained a series of Memorandums of Record written by McAllister or Bowman.

105. Central to this LOR was two instances in which Bowman contended that she didn't approve of Mitchell's training on AGILE in November, 2017.

106. Bowman testified that AGILE would send the supervisor notifications of the training, but she didn't recall if she got this notice.

107. If an employee, like Nyasha Mitchell was missing, Bowman testified she could have gone into AGILE and see if she's at training.

108. In fact, even though Bowman claimed Mitchell was missing, Bowman testified that Bowman or McAllister contacted people in Chantilly, VA, to see if Mitchell was there.

109. Bowman also contended that Mitchell never obtained Bowman's authority to attend the training in Chantilly, VA in November, 2017.

110. Bowman approved of the training Mitchell received in the fourth quarter of 2017. Complainant Exhibit 7.

111.     An October 18, 2017, email exchange between Mitchell and Bowman indicates that at 10:42 am, Bowman told Mitchell she checked with AGILE because she didn't see where she's supposed to approve on the form. Exhibit 8.

112.     This indicates that Bowman objectively let Mitchell know she did approve of the training. That which was left was just a formality.

113.     Also central to the Reprimand were events on November 20, 2017. On one occasion, McAllister asked, yet another non-supervisor, branch SIA Linda Kallister to join his audience in scolding Mitchell, allegedly because she was familiar with NM's performance. Agency Exhibit 9. Mitchell challenged that Kallister should be there. Id.

114.     Douglas Wade, served as the Deputy Chief for Analysis from May 27, 2016 to March 22, 2017.

115.     During that time, Wade's first level supervisor was Mary Matthews.

116.     Wade was McAllister's direct supervisor from October, 2016 to December 31, 2017.

117.     Wade testified that Kallister did not have supervisory authority over Mitchell. Mitchell is written up.

118.     On October 2, 2018, the Agency issued a Notice of Proposed Five (5) Day Suspension.

119.     The proposal charged Mitchell with (a) Submission of Inaccurate Time and Attendance Documents; and (b) Failure to Follow Leave Requesting Procedures. Exhibit 10.

120.     The Agency suspended Mitchell for two days for the alleged reasons stated on the Proposed Five (5) Day Suspension. Exhibit 11.

121.     The agency never charged Mitchell with time fraud or any other kind of fraud.

122.    The agency never proved time fraud against Mitchell.

123.    The agency had a badge swipe system which would record the times that employees like Nyasha Mitchell would enter or leave the building in which she worked for the agency.

124.    The agency contended that based on those badge swipes Mitchell reported more work hours on her time sheets than she was in the building.

125.    Embedded in this system is a guaranteed lunch period, whether the employee actually took lunch or worked through lunch.

126.    According to the Agency, there is no concept of an employee working through lunch; the employee took lunch each and every day because the agency's system says so.

127.    In November, 2016, Daniella Yantin, became a Special Agent, Criminal Investigator, for the Office of Inspector General, Defense Intelligence Agency.

128.    She held that position consecutively from November, 2106 through January, 2020.

129.    Between May, 2016 and sometime in August, 2019, April Hodges worked for the Agency as an Employee Relations Specialist.

130.    Sometime around the summer or fall of 2018, Kevin Vasquez became Nyasha Mitchell's supervisor.

131.    Between January, 2016 and 2019, Lamont Bogier was an Employee Management Relations Specialist at the Agency.

132.    Bogier testified that he had no way of knowing if Mitchell was authorized to work through lunch.

133.    The Agency report lists a time period of January 1, 2016 to March 31, 2017.
Agency Exhibit 12.

134.    However, the sheets that Yantin relied on skip periods of time with than time
interval. Exhibit 13.  The first five pages and 11-14 of that exhibit cover the time period of
5/1/17 to 7/14/17. The next five pages cover October and November 2017. Id. The last seven
pages cover January 1, 2016 to April 20, 2016. Most of these records are out of the subject time
frame.

135.    Plaintiff's Exhibit 14 covers the time period of May 29, 2016, to December 18,
2016. Some of the entries have negative balances, meaning Mitchell worked additional time,
which is the reason it was deducted from the balance allegedly owed. There's no record of those
remaining months from January to May 28, 2016 or from January 1, 2017 to March 31, 2017.

136.    In addition, Plaintiff's Exhibit 15, demonstrates that leave requests 61-68 are
missing.

137.    Hodges testified that only if the employee swipes are off by $5,000 or more then
the case is referred to OIG.

138.    Ultimately, the amount in question was much less than $5,000.

139.    According to Yantin, EMR does not mitigate until OIG sends it back.

140.    So EMR could in essence claim any number against an employee against whom it
sought to retaliate.

141.    Yantin testified that she got the case from Bogier.

142.    According to Yantin, both Bogier and Bowman told Yantin about Mitchell's EEO
complaint. Exhibit 16.

143.    As such, Bogier certainly knew that Mitchell had complained about discrimination before October, 2018 and like McAllister, told another employee about it.

144.    At the EEOC hearing, Bogier testified that the first time he became aware of the Mitchell's discrimination complaint was around April, 2019, when he took a deposition. Exhibit 17.

145.    The next step in the process was Vasquez reviewing the OIG report and making a decision as to the proper discipline, if any, to propose against Mitchell.

146.    Kevin Vasquez testified that he wouldn't have suspended Mitchell.

147.    Bogier unduly influenced Vasquez's decision to proposed a suspension against Mitchell.

148.    Because of Bogier's instructions to Vasquez, he had to change his recommendation to five day proposed suspension.

149.    Bogier told Vasquez he had to propose a five-day suspension because Vasquez was a representative of the agency.

150.    Kevin Vasquez testified that in other situations with other employees similar to Mitchell, involving inaccurate time and attendance records, it never went to a suspension.

151.    Bogier never sent a list of comparators to Kevin Vasquez.

152.    But for Bogier, Vasquez wouldn't have proposed the suspension

153.    Bogier did not recall if he did a Douglas Factors analysis.

154.    Furthermore, the proposal did not describe or list as a factor prior discipline.

155.    The Decision to Suspend for two days was issued by Megan Elliot, Chief, SCIF Management Branch, Security Programs Office.

156.    Unlike the Proposed Suspension, the Notice of Suspension, listed as past discipline listed is a Letter of Reprimand referencing the failure to follow leave procedures that could be akin to the previous charge of failure to follow instructions. Id. Table of penalties lists that charge even on a second occurrence as a reprimand to a 30 day suspension. It's certainly the weaker of the two charges.

157.    Bogier's interference didn't stop with the proposing official. It continued to the decision maker. Elliot testified that at first she wanted no suspension, but Bogier told her that such decision would not be consistent with similarly situated cases.

158.    Bogier never submitted to Elliot a list of similarly situated cases.

159.    The agency has never produced a list of similarly situated cases.

160.    Bogier unduly influenced Elliot's decision to suspend Mitchell for two days.

161.    McAllister's conduct and decisions were discriminatory and based on race. The only employees who received letters of counseling under McAllister were minority women, and a white peer had performance problems but was promoted instead.

162.    Finally, Mitchell was suspended for two days after being accused of submitting inaccurate timecards and failing to follow leave procedures.

163.    The suspension was unwarranted based on the facts because Mitchell did not commit any violations and because the discipline was more severe than similar cases.

164.    The entire disciplinary process was tainted by the influence of Bogier, who told one of the other employees that Bogier was working with management on Mitchell's discrimination complaint.

165.    As retaliation for the discrimination complaint, Bogier improperly influenced the disciplinary process by advocating for a five-day suspension to Kevin Vasquez, the recommending official.

166.    Further, Bogier influenced the decision-maker, Elliot, by persuading him to include a suspension as part of the discipline imposed.

## COUNT I – TITLE VII RETALIATION – TWO DAY SUSPENSION

Mitchell incorporates by reference all preceding paragraphs herein.

167.    Mitchell engaged in protected activity when she explicitly informed her supervisor, McAllister, that she believed racial discrimination was occurring in the office.

168.    McAllister was interviewed by the EEO Counselor on or about October 6, 2016.

169.    The EEO Counselor reported that McAllister told her that about a year before his interview, October, 2015, Mitchell complained to him that her team wouldn't let her produce anything because she was African-American.

170.    In response to Mitchell's discrimination complaint, McAllister told her that there was nothing he could do about it in his current position.

171.    Mitchell further engaged in protected activity when she contacted the EEO office as stated above.

172.    Mitchell again engaged in protected activity when she filed a formal complaint of discrimination with the EEO office as stated above.

173.    On May 16, 2017, McAllister notified Spencer Way, Douglas Wade and Sonya Bowman about Mitchell's EEO Complaint.

174.    In fact, on said date, McAllister sent a copy of Mitchell's EEO Complaint to Way, Wade and Bowman. ROI at 456.

175.    Wade testified at hearing that there was no reason for McAllister sending a copy of Mitchell's EEO Complaint to these other agency employees on May 16, 2017.

176.    On April 26, 2017, Douglas Wade gave testimony to an EEO investigator.

177.    On April 26, 2017, Mary Matthews gave testimony to an EEO investigator.

178.    On April 26, 2017, April Hodges gave testimony to an EEO investigator.

179.    On October 6, 2016, the EEO Counselor interviewed McAllister and advised him of Mitchell's EEO complaint.

180.    Bogier claimed he found out about Mitchell's EEO case when April Hodges deployed.

181.    April Hodges deployed in November, 2015.

182.    Mary Matthews testified she learned about Mitchell's EEO complaint a number of months before she gave her April 26, 2017, EEO testimony.

183.    Bogier's undue interference with Mitchell's suspension was an act of retaliation.

184.    Bogier exercised a singular influence over the proposing official, Vasquez.

185.    Bogier exercised a singular influence over the deciding official, Elliot.

186.    Vasquez's decision to propose the five-day suspension was based on blind reliance on Bogier.

187.    Elliot's decision to issue the two-day suspension was based on blind reliance on Bogier.

188.    Vasquez was the proposing official for the suspension in name only.

189.     Elliot was the deciding official for the suspension in name only.

190.     The suspension was a tangible employment action.

191.     Bogier retaliated against Mitchell by seeking unwarranted discipline based on spurious allegations.

192.     Bogier sought discipline against Mitchell, including a suspension, because of her prior protected activity.

193.     Bogier's decisions to interfere and unduly influence the suspension proposal and decision were motivated by Mitchell's EEO protected activity.

194.     Similarly situated employees who did not engage in EEO protected activity did not have Bogier unduly influence discipline.

195.     Bogier's aforesaid actions would reasonably deter an employee from complaining about discrimination.

196.     Through these actions, Defendant violated Title VII's prohibition on retaliation.

197.     Because of Defendant's actions, Mitchell suffered lost income, benefits, and the opportunity for future promotions and employment, as well as mental and emotional distress.

198.     McAllister sabotaged Mitchell's attempt to obtain the security office rotation by attaching her EEO complaint to her packet as a blatant act of retaliation.


**COUNT II – TITLE VII RETALIATION – PRIVACY VIOLATION**

Mitchell incorporates by reference all preceding paragraphs herein.

199.     McAllister's action of sharing Mitchell's EEO Complaint with Spencer Way, Douglas Wade and Sonya Bowman is an act of Per-Se retaliation.

200.    McAllister's action of sharing Mitchell's EEO Complaint with Spencer Way, Douglas Wade and Sonya Bowman has a chilling effect on employees complaining about discrimination.

201.    McAllister's aforesaid actions were motivated by Mitchell's EEO protected activity.

202.    Similarly situated employees did not have McAllister pass around their EEO complaints.

203.    McAllister's aforesaid actions would reasonably deter an employee from complaining about discrimination.

204.    McAllister attached the EEO complaint to Mitchell's packet because of her prior protected activity.

205.    Through these actions, Defendant violated Title VII's prohibition on retaliation.

206.    Because of Defendant's actions, Mitchell suffered lost income, benefits, and the opportunity for future promotions and employment, as well as mental and emotional distress.

## COUNT III – TITLE VII RETALIATION
## THE MARCH 2018, LETTER OF REPRIMAND

Mitchell incorporates by reference all preceding paragraphs herein.

207.    The March, 2018, Letter of Reprimand was cited in Mitchell's two-day suspension.

208.    The March, 2018, Letter of Reprimand was relied on by management to issue Mitchell the two-day suspension.

209.    The March, 2018, Letter of Reprimand was a tangible, adverse action.

210.    As stated above, Bowman was aware of Plaintiff's EEO activity.

211. As stated above, the reasons for the Letter of Reprimand were false.

212. Bowman's aforesaid actions were motivated by Mitchell's EEO protected activity.

213. Similarly situated employees who did not engage in EEO activity did not have these actions taken against them.

214. Bowman's aforesaid actions would reasonably deter an employee from complaining about discrimination.

215. Bowman issued the Letter of Reprimand because of Mitchell's prior protected activity.

216. Through these actions, Defendant violated Title VII's prohibition on retaliation.

217. Because of Defendant's actions, Mitchell suffered lost income, benefits, and the opportunity for future promotions and employment, as well as mental and emotional distress.


**COUNT IV – TITLE VII RETALIATION – ADDITIONAL ACTS OF RETALIATION**

Mitchell incorporates by reference all preceding paragraphs herein.

218. As stated above, in response to Mitchell's discrimination complaint, McAllister advised her there was nothing he could do in his then present position.

219. There came a point, in May, 2016, when McAllister had become familiar with his new duties and his direct reports.

220. At McAllister's first reasonable opportunity, he retaliated against Mitchell by issuing three undeserved LOCs.

221. McAllister then continued to retaliate against her by meeting with her co-workers, as described above and showing Mitchell's path to a PIP.

222.    McAllister then continued to retaliate against her by lowering her 2016 Appraisal score and by issuing comments related to the contentious interactions between Mitchell and McAllister during that performance year.

223.    Hodges testified that such a comment or factor should never be contained on a Job Appraisal.

224.    McAllister's aforesaid actions regarding the appraisal were intentional.

225.    McAllister was fully aware of the Agency's Rules and Procedures barring his aforesaid actions.

226.    Even Mitchell was aware of the Agency's Rules and Procedures barring his aforesaid actions.

227.    McAllister continued to retaliate against Mitchell by delaying her application to the aforementioned 2017, 90 Day Rotational assignment.

228.    McAllister continued to retaliate against Mitchell by writing her up with respect to the aforementioned May, 2017, alleged hostile work environment.

229.    McAllister's aforesaid actions were motivated by Mitchell's EEO protected activity.

230.    Similarly situated employees who did not engage in EEO protected activity did not have McAllister do these aforesaid actions.

231.    McAllister's aforesaid actions would reasonably deter an employee from complaining about discrimination.

232.    All of these actions taken together changed the rights and benefits of Mitchell's employment.

233.     All of these actions taken together along with the aforementioned confidentiality breach by McAllister against Mitchell changed the rights and benefits of Mitchell's employment.

234.     Through these actions, Defendant violated Title VII's prohibition on retaliation.

235.     Because of Defendant's actions, Mitchell suffered lost income, benefits, and the opportunity for future promotions and employment, as well as mental and emotional distress.

## COUNT V – TITLE VII DISCRIMINATION BASED ON RACE – HOSTILE WORK ENVIRONMENT

Mitchell incorporates by reference all preceding paragraphs herein.

236.     Defendant engaged in a pattern of discriminatory conduct against Mitchell as stated above.

237.     Defendant acted through McAllister who has admitted that he does not get along with black women and is known in the office as Uncle Tom.

238.     Defendant also acted through others as described above.

239.     Each of the actions listed above was taken because of Mitchell's race, which is African American.

240.     Defendant's actions against Plaintiff were unwelcome.

241.     The Defendant's actions against the Plaintiff were done by her supervisors.

242.     The Defendant engaged in behavior that was sufficiently severe and pervasive to alter the conditions of Plaintiff's employment.

243.     The Defendant's actions altered the terms and conditions of Plaintiff's employment and created an abusive atmosphere.

244.     Plaintiff's supervisor, Raymond McAllister, had the power to hire, fire, promote, discipline and take employment actions with respect to Plaintiff.

245.     McAllister's aforesaid actions against the Plaintiff were objectively and subjectively hostile and unwelcome.

246.     Similarly situated non African-Americans were not subject to this environment or these actions.

247.     Defendant has violated Title VII by engaging in unlawful racial discrimination.

248.     The Report of Investigation indicated that between 2015-2016, every single counseling issued by either James Medler or Raymond McAllister was issued to a black or brown female.

249.     Because of Defendant's actions, Mitchell suffered lost income, benefits, and the opportunity for future promotions and employment, as well as mental and emotional distress.

## COUNT VI – TITLE VII DISCRIMINATION BASED ON GENDER – HOSTILE WORK ENVIRONMENT

Mitchell incorporates by reference all preceding paragraphs herein.

250.     Defendant engaged in a pattern of discriminatory conduct against Mitchell as stated above.

251.     Each of the actions listed above was taken because of Mitchell's gender, which is female.

252.     Defendant's actions against Plaintiff were unwelcome.

253.     The Defendant's actions against the Plaintiff were done by her supervisors.

254.     The Defendant engaged in behavior that was sufficiently severe and pervasive to alter the conditions of Plaintiff's employment.

255.     The Defendant's actions altered the terms and conditions of Plaintiff's employment and created an abusive atmosphere.

256.     Plaintiff's supervisor, Raymond McAllister, had the power to hire, fire, promote, discipline and take employment actions with respect to Plaintiff.

257.     McAllister's aforesaid actions against the Plaintiff were objectively and subjectively hostile and unwelcome.

258.     Similarly situated males were not subject to this environment or these actions.

259.      Defendant has violated Title VII by engaging in unlawful gender discrimination.

260.     Because of Defendant's actions, Mitchell suffered lost income, benefits, and the opportunity for future promotions and employment, as well as mental and emotional distress.

**COUNT VII – TITLE VII RACE DISCRIMINATION**
**LETTER OF REPRIMAND**
**TWO DAY SUSPENSION**

Mitchell incorporates by reference all preceding paragraphs herein.

261.     Bowman's aforesaid actions were motivated by Mitchell's race.

262.     Similarly situated non African-American employees did not have these actions taken against them by Bowman.

263.     The two-day suspension was an adverse, tangible employment action.

264.     The aforementioned actions by Bogier in unduly influencing Elliot and Vasquez were motivated by Mitchell's race.

265.     Similarly situated employees, not African-American, did not have these actions against them by Bogier.

266.     Through these actions, Defendant violated Title VII's prohibition on race discrimination.

267.     Because of Defendant's actions, Mitchell suffered lost income, benefits, and the opportunity for future promotions and employment, as well as mental and emotional distress.

## COUNT VIII – TITLE VII GENDER DISCRIMINATION
## LETTER OF REPRIMAND
## TWO DAY SUSPENSION

Mitchell incorporates by reference all preceding paragraphs herein.

268.     Bowman's aforesaid actions were motivated by Mitchell's gender.

269.     Similarly situated male employees did not have these actions taken against them by Bowman.

270.     The two-day suspension was an adverse, tangible employment action.

271.     The aforementioned actions by Bogier in unduly influencing Elliot and Vasquez were motivated by Mitchell's gender.

272.     Similarly situated males did not have these actions against them by Bogier.

273.     Through these actions, Defendant violated Title VII's prohibition on gender discrimination.

274.     Because of Defendant's actions, Mitchell suffered lost income, benefits, and the opportunity for future promotions and employment, as well as mental and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mitchell prays for judgment against Defendant as follows:

A.      That the Court order Defendant to pay compensatory damages, including but not limited to, lost back pay, plus interest, lost fringe benefits and future lost earnings and fringe benefits, damages for emotional distress and pain and suffering, according to proof allowed by law;

B.      That the Court grant Plaintiff compensatory damages for the humiliation, emotional distress, and other damages caused by Defendant's conduct;

C.      That the Court grant Plaintiff all employment benefits she would have enjoyed had she not been discriminated and retaliated against;

D.      That the Court grant Plaintiff expenses of litigation, including reasonable attorneys' fees;

E.      That the Court grant Plaintiff an award of prejudgment and post-judgment interest;

F.      That the Court grant Plaintiff all other relief the Court deems just and proper.


 /s/  Morris E. Fischer_____
Morris E. Fischer, Esq.
Morris E. Fischer, LLC
8720 Georgia Ave. Suite 210
Silver Spring, MD 20910
301-328-7631 Office
301-328-7638 Fax
morris@mfischerlaw.com
Attorney for Plaintiff


**JURY DEMAND**

The plaintiff hereby demands a jury trial on all issues so triable.

Dated: May 27, 2020

_/s/_Morris E. Fischer_____

Morris E. Fischer, Esq.
Morris E. Fischer, LLC
8720 Georgia Ave. Suite 210
Silver Spring, MD 20910
301-328-7631 Office
301-328-7638 Fax
morris@mfischerlaw.com
Attorney for Plaintiff